On the Merits.
It is safe to say that had the price of timber fallen, or remained the same, instead of greatly risen, after the sale sought to be annulled for lesion in this case, this suit would never have been brought.
The questions are as to what quantity of merchantable timber there was upon the land, and as to what was the value of the timber at the time of the sale.
One of the witnesses for plaintiff testified in his examination in chief as follows:
“Q. Mr. Williams, I believe you have an interest in this case, or in the result of it?
“A. Yes, sir; I suppose so. I am not sure of it.
“Q. Please state to the court what your connection with the case is.
“A. Why, I don’t know that I have any connection with the case, as I had a contract with Dormon & Reynolds to get a per cent, of all the cases that I worked up.
“Q. That you employed them in, you mean?
“A. That I got for them; and I didn’t get this case.
“Q. Then you have no interest in this case?
“A. I guess they will give me something out of it.
“Q. Have you done any work in the case?
“A. Yes, sir.
“Q. The count and measure, etc., that you have testified to, is that what you refer to?
“A. Yes, sir.
*33 “Q. And you expect to be paid a fair and proper amount for your services?
“A. Why, I don’t know what they are going to pay me, I know they will pay me what is right though.”
And on cross-examination he testified as follows:
“Q. Didn’t you say that you were employed by Dormon & Reynolds, and that you were to have a per cent., a certain per cent., of all the cases that you stirred up?
“A. I didn’t say that, sir. I said all the cases that I got for them. I didn’t say stirred up at all.
“Q. What's the difference? What do you mean by the difference in stirred up and got up then?
“A. I mean all the cases that I had connection with.
' “Q. Didn’t you testify in a previous case here that you did stir up all this litigation?
“A. No, sir; I didn’t testify that I stirred up this case. I testified that I got a number of cases.
“Q. Testified that you were in the lesion business, didn’t 3;ou?
‘‘A. Yes, sir.
‘‘Q. And that that was about the only business you were in at the time?
“A. No, sir.
“Q. What other business?
“A. Why, I worked for Dormon & Reynolds and Mr. Reynolds and some other parties.
“Q. What other business did you have the first part of this year?
“A. I was with Mr. Reynolds the first part of this year. I wasn’t here.
“Q. What per cent, were you to get?
“A. I was to get 25 per cent, of the gains.
“Q. Did you ride out through the country and solicit all these people to bring suits?
“A. Didn’t solicit these people. I went to some people and explained to them that the lumber companies had taken their property for nothing and that they could recover it.
“Q. How long have you been in the lesion business ?
“A. I have been working in this business some of the time for about two years, I suppose; probably a little longer.”
Mr. Reynolds, one of the witnesses of plaintiff for proving the value of the timber and one of the attorneys for plaintiff, testified as follows:
“Q. What is your interest in this case, Mr. Reynolds?
“A. Well, in the first place, I am. responsible for the costs; and, in the next place, I get probably about 40 per cent, of the fee that would be recovered.
“Q. Which would be half of what was recovered?
“A. Well, I think so.”
In the case of Rogers v. Same Defendant, 55 South. 702,[1] this day decided, the same witness Williams testified, as follows:
“Q. Mr. Williams, how old are you?
“A. Twenty-eight years old.
“Q. What is your business?
“A. I work for the Dormon & Reynolds and Mr. Reynolds.
“Q. You have been employed by them, and you have gotten up pretty nearly all these suits, haven’t you?
“A. Why, some of them; yes, sir.
“Q. You have gone around and solicited these various plaintiffs to bring various suits for lesion beyond moiety?
“A. Some of them I did; but I didn’t these in these cases.
“Q. That has been your business?
“A. Yes, sir.
“Q. For the past year?
“A. Yes, sir.
“Q. Do you work on a salary, or are you interested in the result of the suits?
“A. AYhen I am working on these suits, I get an interest in the suits.
“Q, You get a percentage of whatever is recovered ?
“A. Yes, sir.
“Q. How many of these suits have you stirred up?
“A. I don’t know the exact number.
“Q. Well, about how many?
“A. Oh well — of lesion suits?
“Q. Yes.
“A. Some five or six or seven.
“Q. AVell, isn’t it some 15 or 16 or 17?
“A. Not of lesion suits; no, sir. I don’t think there is more than half that many.
“Q. Lesion is your specialty, isn’t it?
“A. No, sir.
“Q. Do you know what lesion is?
“A. Yes, sir.
“Q. What did you before you went into the lesion business?
“A. I worked.
“Q. AATiat sort of work?
“A. First one kind and another.
“Q. You have no regular job?
“A. Yes, sir; I was in the commission business in Shreveport just before I went into this business.”
It is thus seen that a number of lesion suits like the present have been brought against the purchasers of timber in that locality as the result of Mr. AVilliams and his associates having spread information that the owners of the timber had sold too cheap; and that the suits have been brought on a *35 speculation, the attorneys to pay all the expenses and retain one-half of the profits.
[2] A lesion suit, at best, when unaccompanied, as in the present case, by any suspicion of actual fraud, does not recommend itself to a court of justice. It calls upon the court to s.et aside a contract to which parties fully capable of contracting, and not alleging any actual error or fraud, have deliberately consented. The law does not countenance such a suit when the property sold is a moveable. “The reason,” says Troplong, Com. of article 1674, C. N., “is that the price of moveables is less constant than that of immovables. * * *
“It would be impossible to find a point of comparison positive enough to establish the ruling price at the moment of the contract.” “For that reason,” says the learned author, “rescission is not admitted in the sales of timber.” Under stress of a legislative act whereby, with no thought to suits like the present, standing timber has been made to retain its character of immovability, after sale, this court has had to recognize that the sale of timber may furnish ground for an action of lesion; but the same reason which, before the passage of said legislative act, would have defeated an action in such a case, continues to apply to this extent, that it will make the courts all the more careful and exacting in requiring full, complete, and unquestionable proof of the lesion.
Plaintiff had three estimates made of the quantity of timber on the land. One was made by two men who had had no experience whatever in that kind of work. One of these men was employed by the same Mr. Williams whose testimony was given above, and the other by the son of plaintiff. The second estimate was made by Mr. Wil-liams and the son of plaintiff themselves, assisted by .another man no better qualified than themselves in the business. The third estimate was made by one who was more or less of an expert in timber estimating.
Defendant had three separate estimates made at different times by three different experts.
The defendant’s experts did not measure the trees, or even count them, but merely estimated them by dividing up' each one-sixteenth section or 40 acres into 5-acre lots, and going through each lot, and estimating the quantity of timber upon it. Plaintiff’s expert proceeded in the same way, except that, instead of dividing up the land in 5-acre lots, he divided it into 10-acre lots.
The manner in which the two nonexperts who made the first estimate for plaintiff proceeded was this: One of them followed the north and south boundary line, while the other followed a parallel line distant “30 or 35 yards,” or “15' or 20 yards,” or “somewhere from 30 to 35 yards, I guess,” within the land; and, as they went along following these parallel lines, each counted the trees in the space between them. After thus counting on one strip, they took another strip alongside, and thus went over the entire land by strips. They counted all trees which they estimated to be 12 inches and more in diameter at the stump. On reaching the end of a strip, if their counts did not agree, they divided the difference. Having in that way ascertained the number of trees, they chose a particular strip of 15 yards running through the land and counted the trees upon it, measuring at the same time their diameter and guessing at their height. They then computed the average quantity per tree in the trees found on this strip, and multiplied this average by the number of trees upon the entire land. They say they found 2,900 trees, containing 2,422,560 feet of lumber.
Plaintiff’s other nonexperts counted the trees in the same way by strips, only their strips were 50, 75, and 100 yards wide, according to the thickness of the woods, and *37 they counted only the trees which they estimated to be 20 inches and more diameter, and their strips ran east and west. Mr. Williams followed one line, and the son of plaintiff the other, and the third man walked in the middle and counted the trees. For obtaining a basis for calculation, they did not, as their predecessors had done, count the trees upon a particular strip, but took 63 trees selected here and there throughout the land as being average trees, and measured their ' diameter and estimated their height. They found 2,165 trees, containing 2,290,550 feet of timber.
Plaintiff’s expert estimator found 1,710,000 feet.
Defendant’s regular expert, on whose judgment and estimate defendant had made its large purchases of timber in that locality, estimated the timber at the time defendant bought it at 750,000 to 850,000 feet. With a view to the present litigation, he made another and more careful estimate, and found 775,000 feet of merchantable timber.
Defendant’s second expert, a professional timber estimator, found 800,000 feet.
Defendant’s third expert, the regular timber estimator of a neighboring' timber company, found 850,000 feet.
As to the value of the timber, the testimony leaves no room for doubt that at the time of this sale timber was selling for 50 to 75 cents per thousand feet. . A higher value is sought to be deduced from the fact that timber companies, as between themselves, after they had blocked together large areas of timber, thereby making it more available for exploitation, and in consequence more valuable, sold it at that time at a much higher price; but the price at which timber was sold under those circumstances is no criterion for the value of timber when sold in small and isolated lots.
The value of timber is purely relative. When of best quality and so situated as to be cheaply hauled to a sawmill with shipping facilities, it is very valuable. When so situated that the cost of transportation would equal its value at the mill, it is worthless for. sale. Not unfrequently its value is minus the cost of ridding the land of it for cultivation. The timber in this present ease was an isolated .tract of not particularly valuable timber. No sawmill with shipping facilities was near to give it value; and it stood on land which had been entered by plaintiff as a homestead, and which therefore she was under the obligation to clear and cultivate, and to which a patent had not yet issued.
“In an action for the rescission of sales for lesion beyond moiety, the value of the property must be tested by the additional consideration of what the property was worth to the vendor at the time of the sale and under the circumstances by which he was surrounded.” Parker v. Talbot, 37 La. Ann. 24.
[3] As to the quantity of the timber, assuming that the interest which Mr. Williams and plaintiff’s son had in the result of the suit, with a view to which the estimates were made by them, in no way warped the judgment of the estimators in guessing at the diameter of the trees as they counted them or in determining whether they were merchantable or not, and in no way influenced their action in selecting the particular trees whose average contents should serve as the multiplicand or multiplier for calculating the contents of the trees upon the land, and in guessing the height of thesé trees, there still remains a wide margin for uncertainty; and in a case of this kind, where the deliberate contract of parties devoid of all fraud is to be set aside, there ought to be certainty, or practical certainty. In Hyde v. Baron, 125 La. 227, 51 South. 126, where, by the way, the timber was situated very much as in this case, and a value of 50 cents per thousand was adopted, the court said:
*39 “The value of property in order to support the law of lesion must not be left to conjecture. There must be certainty.”
And to the same effect is the settled jurisprudence of this court. The cases can be found in the digests. An extract from Snoddy v. Brashear, 13 La. Ann. 469, will, however, be apposite here:
“The most scrupulous care is to be exercised in estimating at a past time the value of real estate, whose fluctuations in a section like ours, undergoing rapid developments, are in striking contrast to the certainty and stability of prices in a country like Prance. The mind, divesting itself of results which, when known, it is prone to believe might have been foreseen, should revert to the point of time indicated, and weigh all the chances against, as well as for, a future enhancement in value.”
The writer of this opinion thinks he knows enough of the timber business to be •satisfied that no .timber company in buying timber would be willing to act upon an estimate made by persons who are trying their hand at timber estimating for the first time; and the evidence in this case shows that timber companies do constantly act upon estimates made precisely in the manner in which the expert estimates were made in this case. True, the discrepancy between plaintiff’s expert and defendant’s three experts is very large, and tends to throw more or less doubt upon the reliability of that mode of estimating; but perhaps it is to be explained by the fact that plaintiff’s expert estimated by the 10-acre lot, instead of by the 5-acre lot. At any rate, the experts stand three to one in favor of defendant.
[4] As the price of the sale was $600, the quantity of merchantable timber on the land, in order that there should have been lesion, would have had to be 2,400,000 feet, at a value of 50 cents per thousand, and 1,600,000 feet, at a value of 75 cents per thousand. We think the preponderance of the evidence is in favor both of a less value than 75 cents and a less quantity than 1,600,000 feet.
Cases of this kind, where parties are seeking, long after the event, to get out of their deliberate contracts, without any suggestion of actual, fraud, do not recommend them- . selves to the court; and still less when, as shown in the present ease, ,and in that of Rogers v. Same Defendant, infra, this day decided, the litigation was industriously inspired, and fostered by speculators.
In conclusion, it may be well to say that the long delay in the decision of this suit has not been due to any hesitation on the part of the court in forming an opinion as to the merits of the case, but has been due entirely to the fact that the court, while it was composed of only four members, as the result of the inability of Justice NIGHOLLS to act, owing to illness, was divided on the motion to dismiss.
The judgment appealed from is set aside, and the suit is dismissed, at plaintiff’s cost.
LAND, J., concurs.

 Post, p. 40.